## BOUNTIFUL BRICK CO. et al. v. INDUSTRIAL COMMISSION OF UTAH et al.

No. 4399.  Decided November 23, 1926.  Rehearing Denied December 21, 1926.  (251 P. 555.)

*Young, Boyle & Moyle* and *James M. Christensen,* all of Salt Lake City, for plaintiffs.

*Harvey H. Cluff,* Atty. Gen., and *J. Robert Robinson,* Asst. Atty. Gen., for defendants.

CHERRY, J.

This is a proceeding, under the Workmen's Compensation Act, to review an award of compensation made by the Industrial Commission to the dependents of Nephi Giles, an employee of the Bountiful Brick Company, who was struck and instantly killed on June 17, 1925, by an electric train operated by the Bamberger Electric Railroad Company, while crossing its track on his way to work.

The employer and its insurer, as plaintiffs here, complain of the award and contend that the conclusion of the Industrial Commission that the employee was killed by an accident, arising out of or in the course of his employment, is not supported in fact or in law. This is the sole question for decision. There is no dispute in the evidence.

The employer operated a brick-making plant at Bountiful, Utah, where the deceased was employed as a fireman. The brick-making plant is situated on the west side of and adjoining the Bamberger Electric Railroad which runs north and south. A switch or siding of the railroad extends into the plant. East of the railroad track is the main settled portion of the city of Bountiful. So far as shown by the evidence, all of the employees of the Brick Company resided east of the railroad track. It was therefore necessary to cross over the railroad track in going to and returning from their work. The right of way of the railroad opposite the brick plant was fenced with wire fences. On the west side and between the right of way and the brick plant there was an opening in the fence between two posts set a few feet apart. The employer's manager testified that men coming from both north and south entered the brick plant through this opening. There was evidence that this was the general point of entrance to and exit from the plant by all employees

who resided east of the railroad track. There was no evidence that any employee ever entered at any other point. In going to the plant, the employees approached the opening in the fence from various directions—some from the north, others from the south, and still others from the east who crawled through the fence on the east side of the railroad right of way.. They all, however, were required to and did either go upon or cross the railroad track opposite or near the opening in the fence, in order to get to the plant. That this was the customary route to and from the brick plant of the employees and that the employer had full knowledge thereof is well established by the evidence.

The deceased employee lived about 1½ miles southeast of the plant. To get to his work, he, of necessity, must cross the railroad track. He had been employed at the plant for several years, and according to the evidence had followed the route above described in going to and from his work. It was while he was crossing the railroad track opposite the opening in the fence, on his way to work, and when within 30 feet of the employer's premises that he was killed.

There is a public road, called the Burns' road, which runs east and west and across the railroad track, at a point about 200 yards south of the brick plant. This road extends west from the railroad track and connects with a public street which runs north and along the west side of the employer's premises. Access to the brick plant from the south side is cut off by a deep ditch, so that, in going to the brick plant along the route of the Burns' road and the public street, it is necessary to travel around to the west side of the employer's premises and then east to the brick plant. This route was available to the deceased employee, but was about one-half mile greater in distance than the one used by him and other employees. There was no testimony that any employee ever traveled this route in going to or returning from his work. The main contention made by the plaintiffs is that there was a route or way available to the employee along the Burns' road and the public street, which, although

greater in distance, was less hazardous because the crossing of the railroad track was a public one where the trains must be operated with greater care to avoid accidents and injuries; that the employée by selecting the shorter route, which traversed the private right of way of the railroad, thereby exposed himself to a greater hazard, and one not necessarily connected with or contemplated by his employment.

In *Cudahy Packing Co. v. Ind. Com.*, 60 Utah, 161, 207 P. 148, 28 A. L. R. 1394 (affirmed 263 U. S. 418, 44 S. Ct. 153, 68 L. Ed. 366, 30 A. L. R. 532) commonly referred to as the Parramore Case, an award of compensation on account of the death of an employee, who was struck and killed while necessarily crossing a railroad track on his way to work, and just before he had reached his employer's premises, was sustained. The proximity of the railroad track to the employer's premises and the necessity of crossing the track daily, in going to and from work, were in the main reasons for the conclusion in that case that the employment involved peculiar and abnormal exposure to a common peril which was annexed as a risk incident to the employment. The only difference seen in the relevant circumstances of the Parramore Case and the case at bar is that in the former the employee had no other choice than to go over the tracks at the place where he was killed, while in this case the employee could have selected the longer route and crossed the track on a public road, where, it is urged, there was less danger. But we think this not a sufficient reason for distinguishing the latter case from the former. In essential principles, the cases are the same. The employee in the case at bar, in crossing the track at the place where he was killed, did what any reasonable person would do under similar circumstances. The route taken was the most direct and shortest and was used by other employees, with the knowledge of the employer who made no objection. The fact that the opening in the fence was allowed by the employer to remain open and be used, in view of the situation

and surrounding circumstances, amounted to an invitation on his part to his employees to use it. With this situation, what would be the reasonable and necessary expectation as to the way employees would get to and from their work? Can it be said that the employment of the deceased, under the circumstances, did not necessarily contemplate that he would go to and from his work according as he was invited by the situation and as other employees did? Of course, it was possible for the employee to have chosen the longer and perhaps the less dangerous route, but, under the circumstances, no reasonable person would expect him to do so. He traveled over the route which was generally used by other employees—the natural, practical, customary route. That his employment contemplated and included in itself the manner of so going to and from his work is, we think, a fair and necessary conclusion. The employee, in crossing the track at any time, was exposed to a peril which is common to all, but by virtue of his employment he was required to cross the track regularly and continuously, thus being peculiarly and abnormally exposed to a common peril. It is the greater degree of exposure to the peril which arises as an incident to the employment which sustains the causal relation between the employment and the accident.

We think the case is within the principle decided in the Parramore Case, and should be ruled accordingly.

The award is affirmed.

GIDEON, C. J. and FRICK and THURMAN, JJ., concur.

STRAUP, J. I dissent.

The Bamberger railway runs north and south. Its right of way is fenced with posts and five strands of wire. The brickyard where the deceased was employed is west of the right of way. About 200 yards south of the brickyard is a public highway, running east and west, crossing the rail-

road right of way. The deceased lived south of the highway and east of the railroad track. On the morning of the accident, he, on leaving his residence to go to work, delivered some eggs at a farmhouse north of the public highway and east of the railroad right of way and about due east of the brickyard. After delivering the eggs, he started to go to the brickyard. In going to the farmhouse, he traveled on foot either through the field or along another public highway, running north and south and east of the railroad right of way. From the farmhouse, he, after delivering the eggs, went through a field to the east fence of the railroad right of way at a point a little north of east from the brickyard, and there crawled through or between strands of wire, and entered upon the railroad right of way, and, while attempting to cross it, was struck by a passing train operated by the railroad company and was killed. He was 74 years of age and hard of hearing. There were no wires down and no opening at the point where the deceased entered the right of way. In the west fence of the railroad right of way, at a point a short distance north of the brickyard and about opposite the place where the deceased entered the right of way, there was what is spoken of as an opening between two posts, caused by the middle wires being down or cut, but the top and bottom were wires up and in place. There is no claim made that there was any trail or path running easterly and westerly across the railroad right of way, and especially none at the place where the deceased entered the right of way. The brickyard company had not anything to do with maintaining the fence, nor was the opening in the west fence maintained in any sense for the use or benefit of the company or with its consent or acquiescence; nor did the opening exist, nor was it maintained as a means of egress from and ingress to the premises of the brickyard company. The company had no duties whatever to perform with respect to the fence or to the opening. How or for what purpose the opening was occasioned or created, or suffered and permitted to be there, is not disclosed. That

it was not done by the brickyard company or by any one directed or authorized by it, and that it was not created as a means of ingress to or egress from the brickyard, and that the brickyard company had nothing to do in suffering and permitting the opening to be there were all clearly shown.

Between the brickyard and the highway to the south there was a ditch, which because, of its depth and not because of water, for there was no water in the ditch, was inconvenient and difficult to cross; but one traveling along the highway on the south, proceeding westerly beyond the end of the ditch a short distance, and then traveling north, had a safe and convenient means to reach the west entrance of the yard. Thus the deceased, ordinarily, in leaving his house, well could have traveled north to the public highway running east and west, thence westerly along the highway and across the railroad right of way at the public crossing, then continue westerly along the highway past the ditch, and then north to the west entrance of the brickyard. That was the natural and a safe and convenient route. If the deceased had duties to perform at the west entrance or portion of the yard, such route was not to any appreciable extent longer than along the public highway to the crossing and then north along the right of way about 200 yards to the opening in the west fence. If he had duties to perform at the east entrance, the latter route was several blocks shorter. Though the natural and safe route was a few blocks longer than the course along or over the right of way, yet that in no particular rendered the natural route inaccessible. The reason given at the hearing was not that the deceased could not have taken the natural and safe route, or that such route was inaccessible, but that the other route was shorter and for that reason more convenient. As to that, I do not find any substantial dispute or controversy in the record. I thus do not find anything to support the finding of the commission that the course pursued by the deceased was the only accessible route or means of ingress to or egress from the plant.

The commission also found that the course pursued by the deceased at the time of his injury and death was a customary route. I do not find sufficient evidence in the record to support that. A witness on behalf of the applicant testified that he saw other employees of the brickyard company travel along the right of way or across it at different places and pass through the opening in the west fence; but, when asked how many he saw do that, he answerd that he saw only two of such employees. The manager of the brickyard company testified that he saw the deceased a number of times going to his work; that his route varied; that it was not always the same; that sometimes he went to the north of the plant and through the opening, sometimes over the Bamberger property, and at times he saw him go along the highway to the public crossing, then travel north along the railroad right of way to the opening in the fence and go through it, but not as a regular thing; that he saw other employees go along the railroad right of way and through the opening in the fence, and that he made no objections, but about a year before the death of the deceased he saw him on the railroad track on an occasion when he barely escaped being struck by a passing train, and he then warned him and told him to stay off the track. Though other employees were not warned and told to keep off the railroad track, the deceased was. But whether the employees were or were not warned, or whether the brickyard company did or did not object to its employees taking or traveling such course, is, as I think, immaterial, for such travel was not on the premises of the brickyard company, but was a chosen way by the employees themselves on their way to and from work, and before they reached or after they had left the premises of the company. The company did not control or in any way attempt to control the manner or course of travel of any of its employees to or from work. That was left entirely with the individual employee. The course taken by the deceased was not the only course open to him, but was one voluntarily chosen by him as being more conven-

ient because it was shorter. I think on the record it is shown beyond dispute that the course so voluntarily taken by the deceased was not, as in the case of *Cudahy Packing Co. v. Ind Comm.*, 60 Utah, 161, 207 P. 148, 28 A. L. R. 1394, the sole means of ingress or egress to or from the place of work, but that there was open to him a natural and safe route which he could have taken but failed to do so, and for his own convenience voluntarily chose a dangerous and unsafe course merely because it was shorter. In the Cudahy Packing Company Case the court, after observing that there was no means or way existing by which the employee could go to the plant where he was employed other than the course taken by him, stated:

"If the liability exists, it is by reason of the fact that the plant or manufacturing establishment is so located that there is no other method or means of approach except over railroad tracks or other dangerous places, and that the same are in such close proximity to the plant that the employee has no election or option in determining or selecting his way of approach."

I thus think this case does not come within the Cudahy Packing Company Case, but is within the rule or doctrine announced in the cases of *North Point Con. Irr. Co. v. Ind. Comm.*, 61 Utah, 421, 214 P. 22, and *Reed v. Lumber Co.*, 225 Mich. 164, 196 N. W. 420, and that the injury and death of the deceased did not arise out of or in the course of his employment. It is clear to me that after he delivered the eggs to his neighbor at the farmhouse, instead of retracing his steps back to the public highway, he went through his neighbor's field to the east fence of the railroad right of way, and there, without license or permission, crawled through or between the strands of wire and without right entered upon the private right of way of the railroad company and was killed. I therefore think the award made by the commission should be set aside.